*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A14-0301**

State of Minnesota,
Appellant,

vs.

Ronald James Chasingbear,
Respondent.

**Filed August 4, 2014**
**Reversed**
**Ross, Judge**
**Concurring specially, Larkin, Judge**

Clay County District Court
File No. 14-CR-13-3688

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Brian J. Melton, Clay County Attorney, Heidi M. F. Davies, Assistant County Attorney, Moorhead, Minnesota (for appellant)

Brian P. Toay, Wold Johnson, P.C., Fargo, North Dakota (for respondent)

Considered and decided by Ross, Presiding Judge; Larkin, Judge; and Willis, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**UNPUBLISHED OPINION**

**ROSS**, Judge

Ronald Chasingbear refused a breath test requested by a Moorhead police officer under Minnesota's implied-consent law after the officer arrested Chasingbear, suspecting that he had been driving drunk. The state charged Chasingbear with the crime of test refusal. The district court deemed the test-refusal statute unconstitutional based on Chasingbear's Fourth Amendment rights and dismissed the charge. We reverse because Chasingbear has failed to meet his heavy burden of establishing that the statute is unconstitutional on any of the theories raised.

## FACTS

A little before midnight on Halloween 2013, Fargo police alerted Moorhead police about an intoxicated domestic-assault suspect headed into Moorhead in a van registered to Ronald Chasingbear. Moorhead officer Nicholas Wiedenmeyer spotted the van and stopped it. Chasingbear was the driver. The officer saw that Chasingbear had minor injuries consistent with the reported assault, and he noticed that Chasingbear smelled strongly of alcoholic beverages and had slurred speech. Officer Wiedenmeyer administered field sobriety tests, which Chasingbear failed.

Officer Wiedenmeyer arrested Chasingbear and took him to the Clay County jail. He read Chasingbear the implied-consent advisory. Chasingbear indicated that he understood the advisory and asked to speak with an attorney, but he did not attempt to contact one. Officer Wiedenmeyer asked Chasingbear to perform a breath test, and Chasingbear refused. The state charged Chasingbear with test refusal under Minnesota

2

Statutes section 169A.20, subdivision 2 (2012), and third-degree driving while impaired under section 169A.26, subdivision 1 (2012).

Chasingbear moved to dismiss the test-refusal charge, arguing that the test-refusal statute is unconstitutional because it punishes him for exercising his constitutional right to refuse to submit to a warrantless search. The parties submitted briefs on the motion, and the district court held that the statute is unconstitutional under the "unconstitutional conditions" doctrine and dismissed the test-refusal charge.

The state appeals.

## ANALYSIS

Our first question is *what is the question*? That is, we must determine the framework of our constitutional review. This case offers three alternatives. First, the district court deemed the test-refusal statute unconstitutional under the unconstitutional conditions doctrine as discussed by the state supreme court after being variously applied by the federal Supreme Court. *See State v. Netland*, 762 N.W.2d 202, 211–12 (Minn. 2009) (citing *Frost v. R.R. Comm'n of Cal.*, 271 U.S. 583, 592, 46 S. Ct. 605, 606–07 (1926)), *abrogated on other grounds by State v. Brooks*, 838 N.W.2d 563 (Minn. 2013). Our review of the record leads us to believe that the district court developed this reason to deem the statute unconstitutional on its own; Chasingbear had not offered this theory, and no party apparently suggested it to the district court. Second, although the state's appellate brief does not expressly frame its argument in terms of substantive due process, in the district court it defended the constitutionality of the statute by relying on this court's substantive due process analysis as applied in *State v. Wiseman*, 816 N.W.2d 689,

3

695 (Minn. App. 2012), *cert. denied*, 133 S. Ct. 1585 (2013), and its argument on appeal also depends on the *Wiseman* analysis as revisited in *State v. Bernard*, 844 N.W.2d 41, 45–46 (Minn. App. 2014), *review granted* (Minn. May 20, 2014). Third, Chasingbear has taken a different approach. He does not argue in direct support of the district court's unconstitutional conditions theory. Instead, he dismisses *Wiseman* as overruled law and castigates *Bernard* as bad law. Then he elaborates on the position he took in the district court and asks us to deem the statute unconstitutional under the approach the Supreme Court took in *Camara v. Municipal Court of San Francisco*, 387 U.S. 523, 532–33, 87 S. Ct. 1727, 1732–33 (1967), because, Chasingbear argues, "the facts and legal issues are identical to those set forth in *Camara*." These ships pass in the night; neither of the parties nor the district court ever attempts to explain why any one of these different frameworks is more or less fitting than the others. So despite the position of the concurring opinion that we can focus our opinion narrowly, we must address each one.

### *Starting Point: Statute Is Constitutional*

Before we assess the statute's constitutionality under each alternative framework before us, we first emphasize two substantial obstacles standing against our affirming the district court's decision regardless of which framework we apply. The first is that a strong presumption of constitutionality accompanies each statute. Under this presumption, we follow the supreme court's approach and exercise our authority to declare a statute unconstitutional only with extreme caution and when absolutely necessary, after the challenger has demonstrated the statute's unconstitutionality beyond any reasonable doubt. *Walker v. Zuehlke*, 642 N.W.2d 745, 750 (Minn. 2002). The

4

second is that this strong presumption as applied to Chasingbear's challenge is elevated by the reasoning of two recent drunk-driving, chemical-testing opinions—one issued by the United States Supreme Court and one by the state supreme court.

The United States Supreme Court recently restated its support for state penalties against test refusal, and it did so in *Missouri v. McNeely*, 133 S. Ct. 1552 (2013), the very Fourth Amendment case on which the district court and Chasingbear rely as the cornerstone of their different theories that the statute offends the Fourth Amendment. To support its decision prohibiting Missouri from warrantlessly drawing blood from a suspected drunk driver without his consent and without exigent circumstances, the *McNeely* Court highlighted several alternatives to warrantless, nonconsensual blood draws, and it expressly described these alternatives as "legal" (that is, *constitutional*). 133 S. Ct. at 1566. The Court reminded us that, among other constitutional penalties that states can rely on to secure chemical-test evidence in drunk-driving cases, a state does not violate a defendant's Fifth Amendment rights by urging a criminal jury to infer from a defendant's refusal to submit to chemical testing that he is guilty of the crime of drunk driving. *Id.* (citing *South Dakota v. Neville*, 459 U.S. 553, 563–64, 103 S. Ct. 916, 922–23 (1983)). While the re-emphasized *Neville* decision is not a Fourth Amendment case, *McNeely* certainly is. And it was in the Fourth Amendment context that *McNeely* expressly reminds us through *Neville* that a state can *constitutionally* use the driver's test refusal (that is, the driver's exercise of his Fourth Amendment right not to be tested without consent) as inferential evidence *to convict the driver of a crime*, even though the Constitution would have prohibited the state from forcing that driver to submit to an

5

actual chemical test. This contrasts sharply with the general rule that due process bars prosecutors from referring to a defendant's refusal to consent to a warrantless search to raise an inference of guilt. *See, e.g.*, *United States v. Runyan*, 290 F.3d 223, 249 (5th Cir. 2002) ("[T]he circuit courts that have directly addressed this question have unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt."); *United States v. Thame*, 846 F.2d 200, 206–07 (3rd Cir. 1988) (holding the same and adding that a defendant's decision to exercise his Sixth Amendment right to counsel cannot serve as evidence of guilt); *State v. Larson*, 788 N.W.2d 23, 32–33 (Minn. 2010) (erroneous to admit defendant's refusal of voluntary DNA test as evidence of guilt); *State v. Jones*, 753 N.W.2d 677, 687 (Minn. 2008) (noting that it would be improper for prosecutor to comment on defendant's refusal to give saliva sample). That the Supreme Court in *McNeely* buttressed its Fourth Amendment holding on the states' lawful authority to rely on test refusals to convict drivers of a crime significantly undermines the district court's conclusion that the Minnesota test-refusal statute is infected by a fatal Fourth Amendment infirmity.

In similar fashion, our state supreme court recently held that an officer's warning to a suspected drunk driver that a chemical test is required and that refusal is a crime does not unconstitutionally coerce the driver to waive his Fourth Amendment rights and consent to a test. *State v. Brooks*, 838 N.W.2d 563, 569–570 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014). Chasingbear cites *Brooks*, but he does not attempt to answer the question that arises from its holding as applied to this case: If the state threatens action that is not unconstitutionally coercive in violation of a person's Fourth Amendment

rights, how can the state's carrying out the threat violate the person's Fourth Amendment rights? Although Chasingbear does not offer an answer, the *Brooks* court, like the *McNeely* Court, suggests one: "Although refusing the test comes with criminal penalties in Minnesota, . . . [and] the choice to submit or refuse to take a chemical test 'will not be an easy or pleasant one for a suspect to make,' the criminal process 'often requires suspects and defendants to make difficult choices.'" *Id.* at 571 (quoting *Neville*, 459 U.S. at 564, 103 S. Ct. at 923).

With this background—that is, beginning with the strong presumption favoring the statute's constitutionality and with the highest state and federal courts heavily suggesting constitutionality—we turn to whether Chasingbear has met his "very heavy burden" to demonstrate beyond a reasonable doubt that the statute is unconstitutional under any of the frameworks presented. *See State v. Johnson*, 813 N.W.2d 1, 11 (Minn. 2012) (quotation omitted). He has not.

### *Unconstitutional Conditions*

The district court concluded that the statute falls invalid under the unconstitutional conditions doctrine. We first comment on how the district court got to this theory before addressing its merits. We have carefully reviewed the record, and we are left believing that Chasingbear never argued to the district court that the statute is unconstitutional under the unconstitutional conditions doctrine. And the state's brief to the district court did not address the doctrine, apparently having no reason to suppose that the district court would introduce it sua sponte. The constitutional theory does not appear in the record until the district court relies exclusively on it in its final order deeming the statute

7

unconstitutional. In other words, rather than holding the constitutional challenger to his heavy burden to prove the statute unconstitutional beyond a reasonable doubt in the face of the strong presumption of constitutionality, the district court instead seems to have joined the contest and carried the burden itself on the challenger's behalf, invalidating the statute as unconstitutional on a theory never presented or argued by either party. Judges are not parties. They have a duty to remain neutral. *See* Minn. Code Jud. Conduct Rule 2.2. Our concern over the apparent lack of judicial neutrality here is aggravated by the additional circumstance that the district court seems to have stepped into territory where the separation of powers especially urges judicial restraint; the ultimate legal conclusion sought here—the constitutional invalidation of a statute—requires the judicial branch to decide whether the executive branch can enforce a law developed by the legislative branch. Despite these concerns, the state has not based its challenge on the apparent lack of judicial neutrality, and we will address the merits of the district court's rationale.

The district court first says that the state supreme court and this court previously "*skirted* the issue of the constitutionality of the test refusal statute." Then it maintains that it can apply the unconstitutional conditions doctrine because, it asserts, the supreme court nonetheless "has *conceded* that 'the government may not grant a privilege on condition that the recipient forfeits a constitutional right,'" quoting *Netland*, 762 N.W.2d at 211, which quoted *Frost*, 271 U.S. at 593–94, 46 S. Ct. at 606–07. And then it concludes that "this is exactly what the legislature has done" with the test-refusal statute. On that rationale, it holds the statute unconstitutional. We believe that the district court erred as a matter of law.

8

The district court's first analytical error is suggesting that the supreme court has already concluded that the unconstitutional conditions doctrine applies in this setting. By stating that the supreme court first "skirted" the question of the constitutionality of the test-refusal statute and then "has conceded" the quoted language from *Netland*, the district court creates the impression that the supreme court has already concluded that the unconstitutional conditions doctrine applies to the test-refusal statute. But the supreme court's express statement in *Netland* belies the conclusion that the district court has inferred. After the supreme court's so-called "concession," it expressly chose *not* to conclude that the doctrine applies where the district court now says it does: "[W]e need not determine whether the unconstitutional conditions doctrine applies to Fourth Amendment rights." 762 N.W.2d at 212. This statement in *Netland* refusing to decide whether the doctrine even applies here was the supreme court's last word on the subject. Neither this court nor the supreme court has ever held that the doctrine applies in this setting. The district court erroneously began its analysis on a faulty premise.

The district court's second error was failing to accurately apply the doctrine here even if it applies in the Fourth Amendment context. A look at the doctrine's purpose informs us that the district court wrongly decided that applying it here would result in invalidating the test-refusal statute. At its core, the unconstitutional conditions doctrine thwarts the government's temptation to extort its citizens by conditioning the grant or denial of some governmental privilege on the surrender of some constitutional right. It arose to limit a legislative practice that wrongly supposes that, just because the government has absolute discretion not to afford a particular privilege to anyone, it

9

always has the authority to grant that privilege only to those who agree to give up something in exchange—particularly, some constitutional right. As the judicial application of the doctrine teaches, sometimes the practice is unconstitutional, sometimes it is not. By not considering the reason that the doctrine arises to restrict the practice in some situations, the district court apparently assumed the premise that the practice is *always* unconstitutional. The purpose and historic application of the doctrine disprove that premise.

Although the doctrine long predates the Supreme Court's 1926 decision in *Frost*, we can begin with that case because *Frost* was the Supreme Court's first unconstitutional conditions case involving the license to operate motor vehicles. In *Frost*, the Supreme Court invalidated a California law in which a state commission conditioned each private commercial hauler's right to use the public highways on the hauler's agreement effectively to "dedicate his [vehicle] to the business of public transportation and subject himself to all the duties and burdens imposed by the act upon common carriers." 271 U.S. at 592, 46 S. Ct. at 606. Because the Due Process Clause does not allow the state to convert "a private carrier . . . against his will into a common carrier by mere legislative command," the state also may not "bring about the same result by imposing the unconstitutional requirement as a condition precedent to the enjoyment of a privilege, which . . . [is] within the power of the state altogether to withhold if it sees fit to do so." *Id*. at 592–94, 46 S. Ct. at 607. This is because the Court believes that "[i]t is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." *Id*. at 594, 46 S. Ct. at 607. This seemingly sweeping

language in *Frost* was relied on expressly by the district court here to hold that, "[a]s applied to Minnesota's test refusal statute, this is exactly what the legislature has done."

But this is not what the Minnesota legislature has done. The district court's treatment of some of *Frost*'s language overlooks two related, fundamental elements of the unconstitutional conditions doctrine as revealed in *Frost* and in virtually all thorough analyses of the doctrine, and both of those fundamental elements are lacking here.

The first overlooked element is the most obvious. The unconstitutional conditions doctrine applies to invalidate legislation only when the state has conditioned its grant or denial of some privilege on the recipient's surrender of a *constitutional* right. *Id.* at 594, 46 S. Ct. at 607 ("If the state may compel the surrender of one *constitutional* right as a condition of its favor, it may, in like manner, compel a surrender of all." (emphasis added)); *Netland*, 762 N.W.2d at 211 ("Principally, the unconstitutional conditions doctrine reflects a limit on the state's ability to coerce waiver of a *constitutional* right where the state may not impose on that right directly." (emphasis added)). As the United States Supreme Court has explained in the implied-consent setting, the "right to refuse the blood-alcohol test, by contrast [to a right rooted in the Constitution], is simply a matter of grace bestowed by the [state] [l]egislature." *Neville*, 459 U.S. at 565, 103 S. Ct. at 923. So the only right Chasingbear surrendered in exchange for the privilege to drive in Minnesota under the implied-consent scheme was a right afforded by statute, not by the Minnesota or federal Constitution. And as demonstrated in *McNeely*, even in an implied-consent setting a person who actually refuses a chemical test after having been reminded of his "implied consent" obligation not to do so has not in fact surrendered the right to

11

withhold actual consent; if he eventually does withhold actual consent, the Fourth Amendment continues to limit the state's constitutional authority to search his body and seize a sample of his blood for chemical testing. *See* 133 S. Ct. at 1557–60 (considering exigent circumstances, not consent, after suspected drunk driver refused to be tested after having been read Missouri's implied-consent advisory).

In other words, according to the Supreme Court, a person suspected of drunk driving has no constitutional right to refuse (that is, to withhold his consent) to be tested without a warrant upon request even though, also according to the Supreme Court, he retains the constitutional right not to actually be tested without a warrant or a valid warrant exception. The somewhat competing notions may be difficult to comprehend using linear reasoning, but this is simply a legal paradox. Legal paradoxes exist and make some constitutional anomalies challenging, if not perplexing, but they do not render them wrong or illogical. *See, e.g.*, *Trop v. Dulles*, 356 U.S. 86, 105, 78 S. Ct. 590, 600 (1958) (Brennan, J., concurring) (accepting that it is "paradoxical [but appropriate] to justify as constitutional the expatriation of the citizen who has committed no crime by voting in a Mexican political election, yet find unconstitutional a statute which provides for the expatriation of a soldier guilty of the very serious crime of desertion in time of war"). And in Minnesota, the suspected drunk driver who refuses a chemical test retains not only the *constitutional* right not to be tested, he also has the additional *statutory* right not to be tested. Minn. Stat. § 169A.52, subd. 1 (2012) ("If a person refuses to permit a test, then a test must not be given."). He nevertheless has neither the statutory nor constitutional right *to refuse* testing without penalty. And because Chasingbear had no

12

constitutional right to refuse to be tested, the district court erroneously concluded that the

state violated the principles of the unconstitutional conditions doctrine by punishing his

refusal.[1]

The second element of *Frost*'s unconstitutional conditions explanation that was

overlooked by the district court does not depend on the first, but it is also dispositive.

That is, even if a person suspected of drunk driving does have a constitutional right to

refuse testing, this does not necessarily invalidate the statute under the unconstitutional

conditions doctrine. Despite *Frost*'s seemingly sweeping language quoted by the district

court, elsewhere the *Frost* Court revealed more narrowly an essential reason for deeming

California's common-carrier law unconstitutional under the doctrine:

> It is very clear that the act . . . is in no real sense a
> regulation of the use of the public highways. It is a regulation
> of the business of those who are engaged in using them. Its
> primary purpose evidently is to protect the business of those
> who are common carriers . . . by controlling competitive
> conditions.

271 U.S. at 591, 46 S. Ct. at 606. The district court missed this significant point of *Frost*,

and indeed, the significant point in the long line of unconstitutional conditions cases: The

unconstitutional conditions doctrine looks to the purpose of the challenged condition, and

it invalidates only those laws whose challenged condition bears no significant relevance

---

[1] As the concurring opinion indicates, this court has also recently concluded that the unconstitutional conditions doctrine does not invalidate the implied-consent statute because the statute does not authorize an unconstitutional search and because, even if it did authorize an unconstitutional search, the statute is not coercive. *Stevens v. Comm'r of Pub. Safety*, ___ N.W.2d ___ (Minn. App. July 14, 2014). We agree that the holding and reasoning of *Stevens* provides an additional basis for our conclusion on this issue.

13

to the governmental objective of the privilege that the government is conditionally conferring.

As one United States Justice recently and accurately summarized, "There is no case of ours in which a condition *that is relevant to a statute's valid purpose* and that is not in itself unconstitutional (*e.g.*, a religious-affiliation condition that violates the Establishment Clause) has been held to violate the doctrine." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2334 (2013) (Scalia, J., dissenting) (emphasis added). The majority in that case clearly agreed, explaining, "By demanding that funding recipients adopt—as their own—the Government's view on an issue of public concern, the condition by its very nature affects protected conduct outside the scope of the federally funded program." *Id.* at 2330 (quotation omitted). Commentators have long understood this, identifying "the most significant" characteristic of invalidated conditions as "the condition's irrelevancy to the attainment of the governmental objectives involved in the extension of the benefit." *Unconstitutional Conditions*, 73 Harv. L. Rev. 1595, 1596 (1960); *cf. Dolan v. City of Tigard*, 512 U.S. 374, 386, 114 S. Ct. 2309, 2317 (1994) ("In evaluating petitioner's [unconstitutional condition] claim, we must first determine whether the essential nexus exists between the legitimate state interest and the permit condition exacted by the city." (quotations omitted)); *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S. Ct. 1790, 1795 (1963) ("We must next consider whether some compelling state interest enforced in the eligibility provisions of the [challenged] statute justifies the substantial infringement of appellant's First Amendment right.").

Nothing in the district court's reasoning here indicates that it attempted to assess or apply this essential element of the unconstitutional conditions doctrine in the implied-consent setting. That is, it seems never to have considered the significance of the relationship between the condition and the state's objectives in conferring the privilege to drive a car. But the significance of the relationship is readily apparent. The conditional bargain of the implied-consent scheme can be summarized this way: Minnesota confers on drivers the privilege of *soberly* operating inherently dangerous motorized vehicles on the state's roadways—vehicles that accounted for about 400 deaths statewide in 2012 (approximately one-fourth of which were alcohol-related), Minn. Dep't of Pub. Safety, *Minnesota Impaired Driving Facts 2012* ii (2013)—and, in exchange, each driver accepts a statutory choice. In that choice, if he is arrested on probable cause of driving while impaired, he will either agree (actually consent) to undergo a noninvasive chemical test for scientific evidence of his precise intoxication level, or he will face civil and criminal penalties substantially equivalent to penalties that await those convicted of driving drunk. Unlike those cases in which the Supreme Court has invalidated laws under the unconstitutional conditions doctrine, the condition imposed here tightly relates to the privilege conferred. The statutory condition that every arrested, apparently drunk, driver agrees to submit to a chemical test or be penalized for refusing the test directly and *only* furthers the state's interest in the sober use of public highways.

In sum, we believe that the district court erred by failing to recognize that, despite a driver's having the constitutional right not *to be tested* without a warrant or a valid warrant exception, suspected drunk drivers have no constitutional right *to refuse* to be

15

tested or to avoid prosecution for that refusal. Because Chasingbear's test-refusal prosecution does not implicate any constitutional right, the district court's unconstitutional conditions conclusion must fail. And even if a suspected drunk driver does have a general constitutional right to refuse testing, the limited encroachment on that right by the state's conditioning his privilege to soberly drive on his consent either to submit to testing or to face criminal penalties is tightly related to the statute's valid purpose. For these independent reasons, in addition to our holding in *Stevens*, we hold that the district court erroneously applied the unconstitutional conditions doctrine to invalidate the test-refusal statute. We next decide whether the statute survives under substantive due process.

### *Substantive Due Process*

Chasingbear implicitly argued to the district court and to this court that the test-refusal statute violates his substantive due process rights because, he maintains, this court's holding to the contrary in *Wiseman* is undermined by *McNeely*. We believe that he overstates *McNeely*'s effect. If this appeal had presented a challenge to the state's authority to collect evidence, our review would specifically follow the Fourth Amendment and the corollary Minnesota constitutional provision of article I, section 10, which provide the express limits on the state's authority to "search" persons and to "seize" evidence. *See, e.g.*, *McNeely*, 133 S. Ct. at 1568 (applying Fourth Amendment analysis to prohibit state from searching a suspected drunk driver's body by hypodermic extraction of blood for chemical testing without a warrant or a valid warrant exception). This is because the specific constitutional amendment that defines the protection

16

prohibiting the specific governmental action, not the general notion of substantive due process, provides the framework for a substantive constitutional challenge. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S. Ct. 1708, 1714 (1998); *Mumm v. Mornson*, 708 N.W.2d 475, 482 (Minn. 2006); *see also Graham v. Connor*, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct [of alleged excessive force], that Amendment, not the more generalized notion of 'substantive due process' must be the guide for analyzing these claims.").

But Chasingbear's challenge relies only indirectly on the Fourth Amendment. He does not challenge the state's authority *to collect* evidence, nor do the facts allow him to do so. *See Lewis*, 523 U.S. at 843, 118 S. Ct. at 1715 ("Substantive due process analysis is therefore inappropriate in this case only if respondents' claim is 'covered by' the Fourth Amendment. It is not. The Fourth Amendment covers only 'searches and seizures,' neither of which took place here."). Unlike in *McNeely*, where the Supreme Court addressed Missouri's authority to collect a suspected drunk driver's blood against his will (both a *search* and a *seizure*), here the state never actually *searched* for nor *seized* evidence. Indeed, Chasingbear refused to provide an evidentiary breath sample for testing, and, by operation of the implied-consent statute, once a person refuses a requested test, "a test must not be given." *See* Minn. Stat. § 169A.52, subd. 1. So instead of challenging the state's authority to search him and seize evidence, Chasingbear actually challenges the state's authority to enforce a statute that punishes him for refusing

17

to provide an evidentiary sample of his breath after his arrest for drunk driving. We therefore turn to the due process analysis.

The due process clauses of the Minnesota and United States Constitutions prohibit the state from depriving a person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV; Minn. Const. art. I, § 7. The Due Process Clause has been held to include an implicit substantive component, protecting individual liberty from "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 665 (1986). Chasingbear's challenge to the state's authority to punish him criminally for refusing to provide a sample of his breath after his arrest for drunk driving implicates his liberty interest. *See Kansas v. Hendricks*, 521 U.S. 346, 356, 117 S. Ct. 2072, 2079 (1997) (describing the freedom from physical restraint as part of "the core of the liberty protected by the Due Process Clause" (quotation omitted)). Before we can assess the state's authority to take Chasingbear's liberty for refusing to provide a breath sample, we must first characterize the nature of the alleged right as either fundamental or not.

We will strictly scrutinize a challenged law that implicates a fundamental right. *Essling v. Markman*, 335 N.W.2d 237, 239 (Minn. 1983). And we will uphold such a law under this strict scrutiny only if it serves a compelling state interest and is narrowly tailored to serve that interest. *See id.* But when a challenged statute does not implicate a fundamental right, we will hold that it violates substantive due process rights only if, applying a rational-basis test, the challenger has established that the statute is not reasonably related to a legitimate governmental interest. *See Reno v. Flores*, 507 U.S.

18

292, 305, 113 S. Ct. 1439, 1448–49 (1993); *In re Individual 35W Bridge Litigation*, 806 N.W.2d 820, 830 (Minn. 2011).

In *Wiseman*, we applied only the rational-basis standard to a substantive due process challenge to the test-refusal statute. 816 N.W.2d at 695. We refused to apply the higher, strict-scrutiny standard, rejecting Wiseman's argument that the refusal statute infringed his fundamental right to refuse a warrantless search. *Id.* We did so by first joining the parties' assumptions that probable cause and exigent circumstances existed at the time of the request and then recognizing that a suspected drunk driver has no fundamental right to refuse a warrantless search under those circumstances. *Id.* at 694–95.

Questioning the viability of *Wiseman*, Chasingbear accurately observes that *Wiseman* predates *McNeely*. But he wrongly concludes that *McNeely* overrules *Wiseman*. *McNeely* was a warrantless *search* case, not a warrantless *test-refusal* case like *Wiseman*. Nothing in *McNeely* undercuts the due process analysis in *Wiseman*; it merely incidentally narrows that class of cases to which *Wiseman* directly applies. Based on the then-widely accepted, pre-*McNeely* understanding that the human body's natural metabolization of consumed alcohol alone establishes exigent circumstances to justify a warrantless chemical test whenever an officer has probable cause to suspect drunk driving, *id.* at 694, the *Wiseman* parties framed their constitutional arguments assuming that "the police [would have been] justified in collecting a sample for chemical testing under the exigent-circumstances exception to the warrant requirement," *id.* at 693. Based on that assumption, we analyzed Wiseman's constitutional challenge to the test-refusal

19

statute by likewise assuming that exigent circumstances existed—circumstances that would have justified a hypothetical nonconsensual warrantless search. *Id.* at 694. *McNeely* holds only that exigent circumstances cannot rest entirely on the human body's natural metabolization of alcohol. 133 S. Ct. at 1568. It does not hold that when exigent circumstances are in fact present an officer would lack constitutional authority to test a noncompliant driver without a warrant. So *McNeely* only limits *Wiseman*'s holding, and it does so only to the extent *McNeely*'s rationale bears on test refusals in cases in which alcohol metabolization alone is the proffered basis for claimed exigency. Although *McNeely* limits those cases to which *Wiseman*'s due process analysis applies, we reject Chasingbear's premise that *Wiseman* has no precedential authority.

While the due process analysis in *Wiseman* remains intact, Chasingbear correctly observes that, here, as in *Bernard*, no exigent circumstances were assumed or proved, and, for our purposes, they are assumed *not* to have existed at the time Officer Wiedenmeyer asked Chasingbear to submit to testing. *See Bernard*, 844 N.W.2d at 46 (discussing the hypothetical impact of exigent circumstances). Based on this lack of exigent circumstances, Chasingbear argues at length that "[a] warrant was required to obtain a sample of [his] blood." That argument is compelling; under these circumstances a warrant would indeed have been required "to obtain a sample of Chasingbear's blood" against his will, because *McNeely* would apply directly and the test results would be suppressed by direct application of the Fourth Amendment and the exclusionary rule. But again, police did not obtain a sample of Chasingbear's blood or even attempt to do so. Our question now is whether substantive due process rights prohibit the state from

20

punishing Chasingbear for refusing to submit to a breath test under the implied-consent law under circumstances in which police would have needed a warrant to force an involuntary chemical test.

Given that no direct Fourth Amendment right is at stake for the reasons stated, we must decide whether a suspected drunk driver's refusal to submit to chemical testing is a fundamental right or something less. The Supreme Court has explained, "[W]e have regularly observed [in a substantive-due-process analysis] that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S. Ct. 2258, 2268 (1997) (quotations omitted). If the question here is very broadly stated—Does a person have a fundamental right to refuse to consent to a warrantless search?—one may say yes, a fundamental right is at stake even if the Fourth Amendment is not *directly* implicated. If, however, the question is more narrowly stated—Does a suspected drunk driver have a fundamental right to refuse to provide a breath sample to reveal the precise quantity of alcohol in his body?—one could say no, a fundamental right is not at stake.

Precedent leads us to believe that the narrow approach to defining the right is the correct approach. The Supreme Court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Id.* at 721, 117 S. Ct. at 2268. In *Glucksberg*, the Supreme Court rejected the court of appeals' framing of the issue broadly as "'whether there is a liberty interest in determining the time and manner

21

of one's death'" or "'is there a right to die?'" and instead framed it as "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Id.* at 722–23, 117 S. Ct. at 2268–69. The Court has also explained that the "Substantive due process analysis must begin with a careful description of the asserted right." *Flores*, 507 U.S. at 302, 113 S. Ct. at 1447 (quotation omitted); *see also McDonald v. City of Chi.*, 561 U.S. 742, 130 S. Ct. 3020, 3053–54 (2010) (Scalia, J., concurring) (explaining that under the due process framework the Supreme Court has "sought a careful, specific description of the right at issue in order to determine *whether that right, thus narrowly defined, was fundamental*").

Following the Supreme Court's lead, we narrowly rather than broadly construe the right at issue here. And narrowly construed, the right at stake is the right of suspected drunk drivers to refuse to submit to chemical testing for alcohol content. This is not a right that is deeply rooted in national history and tradition. To the contrary: to the extent history and tradition on the subject exist, we think they embody state drunk-driving laws that prohibit drunk-driving suspects from refusing police requests for chemical testing, and they have done so in the implied-consent setting without any regard to whether exigent circumstances exist to support a warrantless blood draw, penalizing those who refuse to be tested. *See McNeely*, 133 S. Ct. at 1566 (explaining favorably that "all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to [alcohol] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense").

22

The short history and tradition of automobile regulation teach us that laws regulating automobile use have existed since their advent. Just over one hundred years ago, auto travel was so rare that operators of horse-drawn vehicles had the statutory authority to demand—by a mere wave of the hand—that any passing motor vehicle must immediately stop and yield until the horse-drawn vehicle passed, and an automobile driver's failure to stop when so signaled was illegal. *See Mahoney v. Maxfield*, 102 Minn. 377, 378–81, 113 N.W. 904, 905–06 (1907) (applying a 1903 Minnesota statute and surveying similar laws in other states). Even by the 1920s, when automobile manufacturing was in its infancy, cars remained so rare that police officers did not use them on patrol, relying instead on horses, bicycles, and the newly introduced motorized cycles. *See Edberg v. Johnson*, 149 Minn. 395, 398, 184 N.W. 12, 13 (1921) ("As an aid to officers on patrol duty no vehicle more serviceable than the motorcycle has as yet been invented. Of course it is possible for such officers to use automobiles instead of motorcycles; but their use would be equally if not more dangerous to others if driven at a high rate of speed.").

Even as relatively few cars were on the road at that time, the statutory prohibition against operating a motor vehicle while intoxicated developed in conjunction with the state's restrictions on issuing drivers licenses. *See, e.g.*, *Mannheimer Bros. v. Kan. Cas. & Sur. Co.*, 147 Minn. 350, 353, 180 N.W. 229, 230 (1920) (discussing Minnesota statute that "directs that no license shall be issued to excessive users of intoxicating liquors, and in another section expressly declares that it shall be a misdemeanor for anyone to drive while intoxicated"). In 1939 no "habitual drunkard" could be licensed to drive in

Minnesota. *See* Minn. Laws. ch. 401, § 4(4), at 783 (codified at Mason's Minn. Stat. § 2720–144(a)(4) (Supp. 1940)). Within 40 years of the onset of automobile-operator licensing, the United States Supreme Court recognized that chemical testing of suspected drunk drivers provides "a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication." *Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S. Ct. 408, 412 (1957). And it recognized that "[m]odern community living requires modern scientific methods of [drunk-driving] detection lest the public go unprotected." *Id.*, 77 S. Ct. at 412. As late as the 1980s, the Supreme Court saw no fundamental right for a suspected drunk driver to refuse to be tested in the implied-consent setting, declaring bluntly, as already noted, "Respondent's right to refuse the blood-alcohol test, by contrast [to a right rooted in the Constitution], is simply a matter of grace bestowed by the [state] [l]egislature." *Neville*, 459 U.S. at 565, 103 S. Ct. at 923.

Chasingbear has provided no caselaw, and we have found none, suggesting that a suspected drunk driver's right to refuse alcohol testing is among those "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." And we discern nothing in this claimed right that is "implicit in the concept of ordered liberty such that neither liberty nor justice would exist if [it] were sacrificed." Chasingbear has not asserted a fundamental right.

The state relies heavily on our decisions in *Wiseman* and *Bernard* to ask us to reverse the district court's decision. In addition to questioning the continued viability of *Wiseman* after *McNeely*, Chasingbear denounces *Bernard*. He insists that *Bernard* "is not

24

good law and is not binding on this or any other Court." He assails it as "directly and impermissibly contradict[ing] the longstanding jurisprudence" of the Supreme Court. Given that no search occurred in *Bernard*, however, and its holding is expressly limited to the constitutionality of the state's authority to criminalize test refusals, 844 N.W.2d at 46–47, he has misinterpreted *Bernard* as holding that an officer can obtain a warrantless, nonconsensual sample of a suspected drunk driver's blood even when exigent circumstances are lacking. Despite this misread, we do not defend *Bernard* here. That case is under supreme court review; and, more important, we do not rely on it for our holding today. Although we have agreed with our premise in *Bernard* that the state's prosecution of a driver's test refusal does "not implicate any fundamental due process rights," we come to that conclusion for different reasons, as outlined above.

We turn to the state's interest in criminalizing test refusals and repeat that it is legitimate. As we held in *Wiseman*: "Impaired drivers pose a severe threat to the health and safety of motorists in Minnesota, and the state has a compelling interest in highway safety that justifies efforts to keep impaired drivers off the road." 816 N.W.2d at 695 (citing *Bendorf v. Comm'r of Pub. Safety*, 727 N.W.2d 410, 416–17 (Minn. 2007)). And more particularly, "the state has a legitimate, time-sensitive interest in obtaining a blood, breath, or urine sample for chemical testing from an individual when the police have probable cause to believe that the individual committed criminal vehicular operation" as well as "an interest in preventing . . . obstruction of a criminal investigation." *Id*. at 695– 96; *see also Neville*, 459 U.S. at 563, 103 S. Ct. at 922 ("Given, then, that the offer of taking a blood-alcohol test is clearly legitimate, the action becomes no less legitimate

25

when the State offers a second option of refusing the test, with the attendant penalties for making that choice.").

We differ from *Wiseman*'s explanation as to why criminalizing test refusal is a reasonable means to accomplish the state's legitimate objective because the circumstances here call for a different analysis. In *Wiseman*, we considered that the state has a legitimate objective in encouraging the driver to peacefully agree to testing so as to avoid putting the requesting "officer in the unfortunate and dangerous situation of having to physically restrain a potentially intoxicated suspect in order to timely obtain a sample against the suspect's will." 816 N.W.2d at 696. In this case, however, where exigent circumstances do not exist, in light of *McNeely*, the officer would have no authority to obtain a sample against the suspect's will. But the test-refusal statute is not reasonable merely because it tends to prevent possible confrontations between police and suspected drunk drivers in involuntary testing. It is also reasonable because it is an efficient tool in discouraging drunk driving. The state has imposed a bright-line limit on a driver's alcohol content, thereby avoiding the need in impaired-driving trials for complicated and confusing disputes over the driver's intoxication level based on competing, highly subjective testimony about driving behavior, number of drinks, time of consumption, and performance of physical sobriety testing. As a companion to the impaired-driving crime, the test-refusal statute is another efficient, bright-line means of conviction in the same context. The Supreme Court long ago recognized and emphasized the legitimacy of these deterrent interests:

> As against the right of an individual that his person be held inviolable, even against so slight an intrusion as is involved in applying a blood test of the kind to which millions of Americans submit as a matter of course nearly every day, must be set the interests of society in the scientific determination of intoxication, one of the great causes of the mortal hazards of the road. And the more so since the test likewise may establish innocence, thus affording protection against the treachery of judgment based on one or more of the senses. Furthermore, since our criminal law is to no small extent justified by the assumption of deterrence, the individual's right to immunity from such invasion of the body as is involved in a properly safeguarded blood test is far outweighed by the value of its deterrent effect due to public realization that the issue of driving while under the influence of alcohol can often by this method be taken out of the confusion of conflicting contentions.

*Breithaupt*, 352 U.S. at 439–40, 77 S. Ct. at 412. Criminally penalizing test refusal therefore not only provides an efficiency, it also reduces the likelihood that drunk drivers will avoid a criminal penalty. This is particularly important under Minnesota's scheme, in which the statute prohibits officers from obtaining any chemical test if the driver elects to refuse testing on request. *See* Minn. Stat. § 169A.52, subd. 1. Without test-refusal criminal penalties, the state could secure a drunk-driving conviction only based on "the confusion of conflicting contentions." *Breithaupt*, 352 U.S. at 440, 77 S. Ct. at 412. Given that the right to refuse testing is not a fundamental right, the state's legitimate interest in criminally penalizing drunk driving and its interest in doing so efficiently are both grounds enough to satisfy our rational-basis inquiry.

Although we have treated Chasingbear's constitutional challenge as one calling only for a rational-basis assessment, we conclude that even if Chasingbear has asserted a fundamental right, still the statute is not unconstitutional under the strictest substantive

27

due process analysis. The state's interest is not merely legitimate, it is compelling. The Supreme Court had no trouble recognizing and colorfully describing the compelling significance of the state's interest in chemical testing the first time it considered the question half a century ago:

> The test upheld here is not attacked on the ground of any basic deficiency or of injudicious application, but admittedly is a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication. Modern community living requires modern scientific methods of crime detection lest the public go unprotected. The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield.

*Briethaupt*, 352 U.S. at 439, 77 S. Ct. at 412. Despite decades of vigorous enforcement and stricter drunk-driving laws, in Minnesota still about 25 percent of about 400 annual highway deaths result from impaired driving. *Impaired Driving Facts*, *supra*, at ii. And because the test-refusal statute implicates only those drivers who are suspected of driving drunk (and, of those, it implicates only those suspected drunk drivers who seek to withhold scientific evidence of their intoxication level and punishes them to the same degree as one convicted of being a drunk driver), it is sufficiently narrowly tailored to achieve the state's compelling objective.

The statute does not fail under substantive due process scrutiny.

### *Fourth Amendment as Applied in* Camara.

Having found no constitutional deficiency in the statute under either the unconstitutional conditions doctrine or substantive due process, we turn to Chasingbear's

argument that we should rely on the Supreme Court's opinion in *Camara*, 387 U.S. at 532–33, 87 S. Ct. at 1732–33, and affirm the district court's holding that the test-refusal statute is unconstitutional. Chasingbear argues simply that "the facts and legal issues are identical to those set forth in *Camara*." We see three problems with Chasingbear's reliance on *Camara*.

The first problem with Chasingbear's reliance on *Camara* has already been alluded to. In *Camara*, the Supreme Court held that the Fourth Amendment precluded the state from prosecuting a resident for refusing to allow a housing-code inspector to enter his home without a warrant. 387 U.S. at 540, 87 S. Ct. at 1736–37. That holding required a preliminary determination that the resident had a constitutional right under the Fourth Amendment to refuse entry in non-emergency situations. *Id.*, 87 S. Ct. at 1737. But as we have already seen, 16 years after the Supreme Court decided *Camara* on the indisputable ground that a resident has a constitutional right to refuse an inspector's non-emergency request for home entry, it informed us in *Neville* that a suspected drunk driver's "right to refuse the blood-alcohol test . . . is simply a matter of grace bestowed by the [state] [l]egislature" and does not arise from the Constitution. *Neville*, 459 U.S. at 565, 103 S. Ct. at 923. To the extent Chasingbear is correct that *Camara* stands for the broad proposition that a state cannot prosecute a person for exercising a Fourth Amendment right to refuse a request for a search, *Camara* is of little bearing here because Chasingbear has no Fourth Amendment right to refuse a request for an alcohol test.

The second problem with Chasingbear's reliance on *Camara* is that Minnesota imposes the implied-consent statute on every driver. And that statute mandates the

29

condition that drivers accept the difficult choice either to submit to chemical testing if requested after being found by police to have apparently been driving while intoxicated or to be subject to civil and criminal penalties. As we have already discussed, this condition is not unconstitutional even if Chasingbear has a Fourth Amendment right to refuse. By contrast, there is no indication in *Camara* that Camara had conditionally received some privilege conditioned on the waiver of his right not to be punished for refusing entry into his home. More important, even if he had, by applying the same unconstitutional conditions principles that we have applied to Minnesota's scheme, we cannot imagine that the home-search scheme in *Camara* could survive the test.

And the third problem with Chasingbear's reliance on *Camara* is that it overlooks the apparent difference between the way the Supreme Court treats cases in which the Fourth Amendment affects searching individuals by testing in the drunk-driving context and those where it affects a home search in any context. *See Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) ("But when it comes to the Fourth Amendment, the home is first among equals."); *Kyllo v. United States*, 533 U.S. 27, 37, 121 S. Ct. 2038, 2045 (2001) (prohibiting police use of thermal imaging based on "the Fourth Amendment sanctity of the home"); *Silverman v. United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 683 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *and cf. Marshall v. Barlow's, Inc.*, 436 U.S. 307, 314–15, 98 S. Ct. 1816, 1820 (1978) (applying *Camara* to a business building). By contrast, we repeat the Supreme Court's observation in *McNeely*—the case built on the drunk driver's Fourth Amendment right not to be

30

tested without a warrant or a valid exception—that states can, instead of actually testing a driver, involuntarily require testing by statute and then impose substantial penalties for a driver's refusing to be tested. 133 S. Ct. at 1566. Given *McNeely*'s factual context, the Court was necessarily referring to penalties arising from a drunk-driving suspect's refusing a chemical test when, like here, exigent circumstances are not present. This leads us to conclude either that the Supreme Court necessarily continues to see the drunk driver's right to refuse a request for chemical testing as something less than a Fourth Amendment right, or that it sees it as a right that does not warrant the same protection as the right to refuse home searches, such as occurred in *Camara*. And especially significant here, the constitutional tools that the *McNeely* Court specifically endorsed include the state's authority to urge a criminal jury to infer from a defendant's refusal to submit to chemical testing that he is guilty of *the crime* of drunk driving. *Id*. We discern no reason to hold that it is unconstitutional to impose criminal guilt for a test refusal while it is constitutional to infer criminal guilt from the test refusal.

We disagree that allowing the state to criminalize a suspected drunk driver's chemical-test refusal somehow authorizes the state to criminalize a person's refusal of a home search, or even an automobile search, particularly in light of *Camara*. Our holding applies to the specific circumstances here. Even if the Fourth Amendment is somewhat implicated by the state's criminal punishment of test refusals, we have not upset the balance implied by Justice Powell's reasoning in *Jenkins v. Anderson*: "[T]he Constitution does not forbid every government-imposed choice in the criminal process

31

that has the effect of discouraging the exercise of constitutional rights." 447 U.S. 231, 236, 100 S. Ct. 2124, 2128 (1980) (quotation omitted).

*Liberty and the Fourth Amendment*

None of the legal bases discussed by the district court or the parties supports the district court's holding that the test-refusal statute is unconstitutional under either the Fourth Amendment or the similar search-and-seizure restrictions in the state constitution. We add that our holding is also practical. These constitutional provisions are intended to guard against real governmental intrusions into personal privacy and liberty. If we were to affirm the district court's invalidation of the test-refusal statute, police officers would have almost no incentive to ask (and a great deal of incentive never to ask) suspected drunk drivers whether they are willing to take a chemical test. This is because every officer knows that the driver will more likely refuse to take the test if the criminal penalties are invalid. And the officer knows that, after a refusal, the officer could not obtain any test. But because the officer wants the chemical evidence, she would always seek, and virtually always obtain, a search warrant for a forced blood draw. She would then draw blood with no regard for the driver's unwillingness. In other words, while Justice O'Connor recognized that "the criminal process often requires suspects and defendants to make difficult choices," including the choice whether to submit to a chemical test or face statutory penalties, *Neville*, 459 U.S. at 564, 103 S. Ct. at 923, Minnesota suspected drunk drivers would no longer have any choice. This practical concern is not the basis of our opinion today, but it informs us that the liberty arguments advanced in this case would not meaningfully produce any real liberty results.

32

*Concurring Opinion*

We agree with the concern stated in the concurring opinion that this case could be reversed for two "simple reasons," specifically that "respondent has not met his burden to demonstrate that the statute is unconstitutional" and that "the district court did not honor the legal principles and standards that should have governed its decision regarding respondent's constitutional challenge." But we cannot take that simple approach. We have given our reasons why the respondent's undeveloped reliance on *Camara* alone falls far short of establishing beyond a reasonable doubt that the test-refusal statute is unconstitutional. Because other constitutional theories were raised, we have also found it necessary to address the doctrine of unconstitutional conditions, which is the theory relied on by the district court in deeming the statute unconstitutional, and substantive due process, which is the theory relied on by the state to contend that the statute is constitutional.

**Reversed.**

**LARKIN**, Judge (concurring specially)

Although I concur with the majority's decision to reverse the district court's ruling that Minn. Stat. § 169A.20, subd. 2 (2012) (the test-refusal statute), is unconstitutional, I would limit the analysis as follows.

The constitutionality of a statute presents a question of law, which appellate courts review de novo. *State v. Cox*, 798 N.W.2d 517, 519 (Minn. 2011). "Minnesota statutes are presumed constitutional and . . . [an appellate court's] power to declare a statute unconstitutional must be exercised with extreme caution and only when absolutely necessary." *Hamilton v. Comm'r of Pub. Safety*, 600 N.W.2d 720, 722 (Minn. 1999). "The party challenging a statute has the burden of demonstrating, beyond a reasonable doubt, that a constitutional violation has occurred." *Id.* In this case, the district court failed to apply those standards when it summarily declared the test-refusal statute unconstitutional based on the unconstitutional-conditions doctrine, even though that theory was not raised or argued by respondent as a basis for relief.

As to the merits of respondent's constitutional claim, respondent does not specifically identify the basis for his challenge. Instead, he generally argues that the test-refusal statute unconstitutionally criminalizes the refusal to consent to a warrantless search, contending that passive refusal to consent to a warrantless search cannot be considered a crime. Respondent relies on *Camara v. Mun. Court of City & Cnty. of San Francisco*, 387 U.S. 523, 87 S. Ct. 1727 (1967), a Fourth Amendment case, for support.

Camara was criminally charged with "refusing to permit a lawful inspection" after he repeatedly refused to let inspectors from the Division of Housing Inspection into his

apartment to make a routine annual inspection, because the inspectors did not have a search warrant. *Id.* at 526-27, 87 S. Ct. at 1729-30. The inspectors were acting under the authority of section 503 of the city housing code, which provided that "[a]uthorized employees . . . shall, upon presentation of proper credentials, have the right to enter, at reasonable times, any building, structure, or premises in the [c]ity to perform any duty imposed upon them by the Municipal Code." *Id.* at 526, 87 S. Ct. at 1729. Camara argued that section 503 was "contrary to the Fourth and Fourteenth Amendments in that it authorize[d] municipal officials to enter a private dwelling without a search warrant and without probable cause to believe that a violation of the [h]ousing [c]ode exist[ed] therein."[2] *Id.* at 527, 87 S. Ct. at 1730. Camara contended that he could not be prosecuted for refusing to allow an inspection unconstitutionally authorized by section 503. *Id.*

The Supreme Court granted review in *Camara* "to re-examine whether administrative inspection programs, as presently authorized and conducted, violate Fourth Amendment rights." *Id.* at 525, 87 S. Ct. at 1729. The Supreme Court held

> that administrative searches of the kind at issue here are
> significant intrusions upon the interests protected by the
> Fourth Amendment, that such searches when authorized and
> conducted without a warrant procedure lack the traditional
> safeguards which the Fourth Amendment guarantees to the

---

[2] Minnesota's implied consent law does not authorize chemical testing unless "an officer has probable cause to believe the person [to be tested] was driving, operating, or in physical control of a motor vehicle in violation of section 169A.20 (driving while impaired)." Minn. Stat. § 169A.51, subd. 1(b) (2012); *see also* Minn. Stat. § 169A.51, subd. 1(c) (2012) ("The test may also be required of a person when an officer has probable cause to believe the person was driving, operating, or in physical control of a commercial motor vehicle with the presence of any alcohol.").

individual, and that the reasons put forth in *Frank v. Maryland* and in other cases for upholding these warrantless searches are insufficient to justify so substantial a weakening of the Fourth Amendment's protections.

*Id*. at 534, 87 S. Ct. at 1733.

After concluding that code-enforcement inspection programs must be circumscribed by a warrant procedure, the Supreme Court determined the standard that should govern the issuance of such warrants. *Id*. at 534-38, 87 S. Ct. at 1733-36. Lastly, the Court concluded that Camara "had a constitutional right to insist that the inspectors obtain a warrant to search and that [he could] not constitutionally be convicted for refusing to consent to the inspection." *Id*. at 540, 87 S. Ct. at 1737.

Respondent argues that "[t]he result of this case should be the same as *Camara*, and the charges against [him] were rightfully dismissed." Respondent's argument fails because the Supreme Court's conclusion regarding Camara's criminal charge was based on its underlying determination that the attempted search would have violated the Fourth Amendment. The same cannot be said of the attempted search in this case.

This court recently considered whether warrantless chemical testing under Minnesota's implied consent law violates the Fourth Amendment's reasonableness standard. *Stevens v. Comm'r of Pub. Safety*, ___ N.W.2d ___, ___, 2014 WL 3396522, at *6 (Minn. App. July 14, 2014). We concluded that

> the state's strong interest in ensuring the safety of its roads and highways outweighs a driver's diminished privacy interests in avoiding a search following an arrest for DWI. Thus, if we assume that the implied-consent statute authorizes a search of a driver's blood, breath, or urine, such a search would not violate the Fourth Amendment.

*Id.* at *10.  We reasoned, in part, that "Minnesota's implied-consent statute contains even more safeguards than the suspicionless-search procedures that were upheld in [*Skinner v. Railway Labor Execs.' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402 (1989)] and, thus, is at least as reasonable, if not more reasonable, for Fourth Amendment purposes than the procedures in *Skinner*."  *Id.* at *9.

Because a search under Minnesota's implied consent law would not violate the Fourth Amendment, *Camara* is not apposite.  Respondent's reliance on *Camara* therefore is unavailing, and he has not otherwise met his burden to demonstrate, beyond a reasonable doubt, that the test-refusal statute violates a constitutional provision.  *See State v. Merrill*, 450 N.W.2d 318, 321 (Minn. 1990) (stating that "the challenger bears the very heavy burden of demonstrating beyond a reasonable doubt that the statute is unconstitutional").

In conclusion, I would reverse for two simple reasons.  First, the district court did not honor the legal principles and standards that should have governed its decision regarding respondent's constitutional challenge to the test-refusal statute.  Second, respondent has not met his burden to demonstrate that the statute is unconstitutional.  It is unnecessary for this court to further justify the constitutional validity of the statute.  *See Hamilton*, 600 N.W.2d at 722 ("Minnesota statutes are presumed constitutional . . . .")..